## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| AMERICAN OVERSIGHT, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. 17-718-RL |
| UNITED STATES DEPARTMENT OF JUSTICE, | ) | |
| and FEDERAL BUREAU OF | ) | |
| INVESTIGATION, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants United States Department of Justice ("DOJ") and the Federal Bureau of

Investigation ("FBI") hereby move for summary judgment pursuant to Fed. R. Civ. P. 56(b) and

Local Rule 7(h) for the reasons stated in the attached memorandum of points and authorities,

statement of material facts, and supporting declarations and exhibits.

Dated:  September 1, 2017

Respectfully Submitted,

CHAD A. READLER
Acting Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

*/s/Amy E. Powell*
AMY E. POWELL
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

AMERICAN OVERSIGHT,        )
                                 )
  Plaintiff,                     )
                                 )
v.                                )
                                 )     Case No. 17-718-RL
UNITED STATES DEPARTMENT OF JUSTICE, )
    and FEDERAL BUREAU OF       )
    INVESTIGATION,               )
                                 )
  Defendants.                 )
                                 )

## STATEMENT OF MATERIAL FACTS IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

As required by Local Civil Rule 7(h)(1), and in support of the Motion for Summary

Judgment, Defendants hereby make the following statement of material facts as to which there is

no genuine issue.

1.     This action arises from FOIA requests submitted by the Plaintiff to the Federal Bureau of

Investigation ("FBI") and DOJ National Security Division ("NSD").  Those requests seek:

> 1)  All warrant applications or other records requesting a court to institute an
> intercept of telecommunications or a pen register trap and trace on electronic
> communications or telecommunications in connection with presidential candidate
> Donald Trump, Trump Tower (located at 725 5th Avenue, New York, NY), entities
> housed in Trump Tower, or any person affiliated with Mr. Trump's campaign,
> whether paid or unpaid, between June 16, 2015, and the present, whether under the
> authority of the Foreign Intelligence Surveillance Act [FISA]; Title III of the
> Omnibus Crime Control and Safe Streets Act of 1968m as amended; or other
> authority.
> 2)  Any court order or other document providing authority to institute or maintain
> such a requested wiretap, intercept, or pen register.
> 3)  Any court order or other document rejecting such an application or request for
> authority for a wiretap, intercept, or pen register.
> 4)  Any records logging or listing any such wiretaps, intercepts, or pen registers.
> 5)  All communications, documents, or other material exchanged between DOJ or the
> FBI and Congress, or briefing papers or talking points prepared for congressional

briefings, regarding the wiretaps, intercepts, or pen registers discussed, or records described, in Items 1-4, supra.

*See* Declaration of David M. Hardy, dated September 1, 2017, ¶ 5 & Exh. A; Declaration of G. Bradley Weinsheimer, dated August 31, 2017, ¶ 4 & Exh. A.  Plaintiff also sought "records describing the processing of this request" and limited the dates of the search "from June 1, 2015 to the date the search is conducted."  Hardy Decl. ¶ 6, 7  Plaintiff further requested expedited processing and a fee waiver.  *Id*, at ¶ 8.

2.      By email dated April 3, 2017, NSD refused to confirm or deny the existence of responsive records, explaining that it does not search for records in response to requests regarding the use or non-use of certain foreign intelligence gathering techniques in which the confirmation or denial of the existence of responsive records would, in and of itself, reveal information properly classified under Executive Order 13526.  *See* Weinsheimer Decl. ¶ 5 & Exhibit B.

3.      Plaintiff appealed NSD's determination to the Department of Justice's Office of Information Policy ("OIP"), by letter dated April 12, 2017.  *See id*. & Exhibit C.  OIP affirmed NSD's determination in a letter dated, April 13, 2017.  *See id*. & Exhibit D.

4.      FBI acknowledged Plaintiff's request by letter dated April 11, 2017, and denied the fee waiver.  FBI had not yet made a final determination at the time Plaintiff filed suit on April 19, 2017.

5.      FBI has acknowledged a counterintelligence investigation of "the Russian government's efforts to interfere in the 2016 presidential election[, including] the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts[, and] an assessment of whether any crimes were committed."  *See* Transcript of the House Permanent Select Committee on

Intelligence Hearing on Russian Interference in the 2016 U.S. Election, March 20, 2017

https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-transcript-fbi-director-

james-comey-testifies-on-russian-interference-in-2016-election/?utm_term=.b9f19a0cf9cf (last

accessed 9/1/2017; Hardy Decl. ¶ 21(A).  That investigation is now under the direction of

Special Counsel Robert Mueller.  *Id*. ¶ 46

6.      President Trump's Twitter account made a four-part post on March 4, 2017:

- "Terrible! Just found out that Obama had my "wires tapped" in Trump Tower just before the victory. Nothing found. This is McCarthyism!"
- "Is it legal for a sitting President to be "wire tapping" a race for president prior to an election? Turned down by court earlier. A NEW LOW!"
- "I'd bet a good lawyer could make a great case out of the fact that President Obama was tapping my phones in October, just prior to Election!"
- "How low has President Obama gone to tapp [*sic*] my phones during the very sacred election process. This is Nixon/Watergate. Bad (or sick) guy!"

Available at https://twitter.com/realDonaldTrump.

7.      During sworn testimony before the House Permanent Selection Committee on

Intelligence ("HPSCI") on March 20, 2017, then FBI Director James B. Comey was asked about

this by Congressman Schiff and responded:

> With respect to the President's tweets about alleged wiretapping
> directed at him by the prior administration, I have no information
> that supports those tweets and we have looked carefully inside the
> FBI. The Department of Justice has asked me to share with you
> that the answer is the same for the Department of Justice and all its
> components. The Department has no information that supports
> those tweets.

*See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian

Interference in the 2016 U.S. Election, March 20, 2017.

8.      Both FBI and NSD confirm that they have no records related to wiretaps as described by

the March 4, 2017 tweets.  Hardy Decl. ¶ 15; Weinsheimer Decl. ¶ 8.  FBI again confirmed that

they do not have any such records by consulting with personnel knowledgeable about Director

Comey's statements and the surveillance activities of the FBI.  Hardy Decl. ¶ 15.

9.      Because Plaintiff's request is broader than the category of alleged wiretaps described in

those statements, however, FBI and DOJ do not confirm or deny the existence of any other

responsive records.  Hardy Decl. ¶ 16; Weinsheimer Decl. ¶ 9.

10.     G. Bradley Weinsheimer is an original classification authority.  Weinsheimer Decl. ¶ 3.

He determined that the information withheld by NSD is protected by Exemption 1.  *Id*. ¶¶ 10-17.

11.     David Hardy is an original classification authority.  Hardy Decl. ¶ 2.  He determined that

the information withheld by FBI is protected by Exemption 1.  *Id*. ¶¶ 19-20, 25-37.

12.     The information withheld pursuant to Exemption 1 is under control of the United States

Government, and contains information pertaining to intelligence activities, sources or methods.

*See* Executive Order 13526 §§ 1.4(c); Hardy Decl. ¶¶ 30-33; Weinsheimer Decl. ¶ 10-17.

13.     The information withheld pursuant to Exemption 1 also pertains to foreign relations.

Hardy Decl. ¶¶ 34-37.

14.     Mr. Weinsheimer and Mr. Hardy both determined that disclosure of the existence or non-

existence of other responsive records would cause harm to national security, and have articulated

the harm that could be expected to occur.  Hardy Decl. ¶¶ 30-37; Weinsheimer Decl. ¶¶ 14-17.

15.     Mr. Hardy further determined that disclosure of the existence or non-existence of

responsive records risks disclosure of intelligence sources and methods and is therefore protected

by the National Security Act and Exemption 3.   Hardy Decl. ¶¶ 38-40.

16.     Mr Hardy determined that surveillance records – if they existed – are records compiled

for law enforcement purposes within the meaning of Exemption 7.  *See* Hardy Decl. ¶¶ 41-43.

17.     Mr. Hardy further determined that disclosure of the existence or non-existence of responsive records could reasonably be expected to interfere with enforcement proceedings that are pending or reasonably anticipated, and that the information is therefore properly withheld under Exemption 7A.   Hardy Decl. ¶¶ 44-49.

18.     Mr. Hardy further determined that disclosure of the existence or non-existence of responsive records would disclose techniques and procedures for law enforcement investigations and that such disclosure could reasonably be expected to risk circumvention of the law, and that the information is therefore properly withheld under Exemption 7E.   Hardy Decl. ¶¶ 50-52.

19.     No authorized Executive Branch official has disclosed the information withheld in this matter.   Hardy Decl. ¶ 14; Weinsheimer Decl. ¶ 18.

20.     NSD and FBI reasonably determined that no responsive "processing records" existed as of the day they began working on the response to the request.   Hardy Decl. ¶¶ 53-55; Weinsheimer Decl. ¶ 19.


Dated:  September 1, 2017                 Respectfully Submitted,

                                          CHAD A. READLER
                                          Acting Assistant Attorney General

                                          ELIZABETH J. SHAPIRO
                                          Deputy Director, Federal Programs Branch

                                          */s/Amy E. Powell*
                                          AMY E. POWELL
                                          Trial Attorney, Federal Programs Branch
                                          Civil Division, Department of Justice
                                          310 New Bern Avenue, Suite 800
                                          Federal Building
                                          Raleigh, NC 27601-1461
                                          Phone: 919-856-4013
                                          Email:  amy.powell@usdoj.gov

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

AMERICAN OVERSIGHT,        )
                                  )
  Plaintiff,                )
                                  )
v.                           )
                                  )    Case No. 17-718-RL
UNITED STATES DEPARTMENT OF JUSTICE, )
     and FEDERAL BUREAU OF        )
     INVESTIGATION,             )
                                  )
  Defendants.              )
                                  )

# MEMORANDUM OF POINTS AND AUTHORITIES
# IN SUPPORT OF DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

CHAD A. READLER
Acting Assistant Attorney General

ELIZABETH J. SHAPIRO
Deputy Director, Federal Programs Branch

AMY E. POWELL
Trial Attorney, Federal Programs Branch
Civil Division, Department of Justice
310 New Bern Avenue, Suite 800
Federal Building
Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

## **Table of Contents**

INTRODUCTION ................................................................................................................. 1

BACKGROUND .................................................................................................................. 2

    I.    Administrative Background ...................................................................... 2

    II.   Factual Background ................................................................................... 3

ARGUMENT ....................................................................................................................... 6

    I.    STATUTORY STANDARDS ................................................................. 6

        A.   The Freedom of Information Act ............................................. 6

        B.   Special Considerations in National Security Cases .................. 7

        C.   The Glomar Response. ............................................................. 9

    II.   NSD and FBI Properly Refused to Confirm or Deny the Existence of Other Responsive Records Pursuant to Exemption One. .......................................... 10

    III.  The Glomar Response Was Proper Under Exemption Three and the National Security Act. ........................................................................................................ 13

    IV.  The Glomar Response Was Proper Under Exemption 7(A). ......................... 15

    V.   The Glomar Response Was Proper Under Exemption 7(E) .......................... 18

    VI.  Defendants Have Not Officially Acknowledged the Existence or Non-Existence of Responsive Records ..................................................................................... 19

    VII. The No-Records Response to the Request for Processing Records Is Appropriate. ....... 23

CONCLUSION ................................................................................................................... 24

## Table of Authorities

<u>**Cases**</u>

*ACLU v. CIA*,
   710 F.3d 422 (D.C. Cir. 2013) ........................................................................................ 19, 20

*ACLU v. Dep't of Def.*,
   628 F.3d 612 (D.C. Cir. 2011) ................................................................................. 8, 14, 21

*Afshar v. Dep't of State*,
   702 F.2d 1125 (D.C. Cir. 1983) ..................................................................................... 8, 20

*Agility Pub. Warehousing Co. K.S.C. v. NSA*,
   113 F. Supp. 3d 313 (D.D.C. 2015) ....................................................................... 13, 14, 21

*Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.*,
   830 F.2d 331 (D.C. Cir. 1987) ............................................................................................ 7

*Blackwell v. FBI*,
   646 F.3d 37 (D.C. Cir. 2011) ........................................................................................... 18

*Bonner v. Dep't of State*,
   928 F.2d 1148 (D.C. Cir. 1991) ....................................................................................... 24

*CIA v. Sims*,
   471 U.S. 159 (1985) ..................................................................................................... 6, 14

*Clapper v. Amnesty Int'l USA*,
   568 U.S. 398 (2013) ........................................................................................................ 11

*Competitive Enter. Inst. v. NSA*,
   78 F. Supp. 3d 45 (D.D.C. 2015) ........................................................................... 13, 20, 21

*Cozen O'Connor v. Dep't of Treasury*,
   570 F. Supp. 2d 749 (E.D. Pa. 2008) ............................................................................... 17

*Ctr. for Nat'l Sec. Studies v. DOJ*,
   331 F.3d 918 (D.C. Cir. 2003) ..................................................................................... 6, 7, 8

*CREW v. DOJ*,
   535 F. Supp. 2d 157 (D.D.C. 2008) ................................................................................... 5

*CREW v. DOJ*,
   746 F.3d 1082 (D.C. Cir. 2014) ..................................................................... 15, 16, 17, 18

*DiBacco v. U.S. Army*,
   795 F.3d 178 (D.C. Cir. 2015) ............................................................................................ 7

*Edmonds Inst. v. Dep't of Interior,*
  383 F. Supp. 2d 105 (D.D.C. 2005) .......................................................................... 24

*Fitzgibbon v. CIA,*
  911 F.2d 755 (D.C. Cir. 1990) ............................................................... 8, 10, 20, 21

*Frugone v. CIA,*
  169 F.3d 772 (D.C. Cir. 1999) ...................................................................... 8, 9

*Gardels v. CIA,*
  689 F.2d 1100 (D.C. Cir. 1982) ................................................................... 9, 14

*Gosen v. USCIS,*
  75 F. Supp. 3d 279 (D.D.C. 2014) ..................................................................... 18

*Gov't Accountability Project v. Food & Drug Admin.,*
  206 F. Supp. 3d 420 (D.D.C. 2016) ..................................................................... 7

*Halperin v. CIA,*
  629 F.2d 144 (D.C. Cir. 1980) ..................................................................... 14

*James Madison Project v. Dep't of Justice,*
  208 F. Supp. 3d 265 (D.D.C. 2016) ..................................................................... 9

*John Doe Agency v. John Doe Corp.,*
  493 U.S. 146 (1989) .................................................................................. 6, 7

*Juarez v. Dep't of Justice,*
  518 F.3d 54 (D.C. Cir. 2008) ..................................................................... 16

*Judicial Watch, Inc. v. Dep't of the Navy,*
  25 F. Supp. 3d 131 (D.D.C. 2014) ..................................................................... 7

*Judicial Watch, Inc. v. DOD,*
  715 F.3d 937 (D.C. Cir. 2013) ..................................................................... 10

*King v. Dep't of Justice,*
  830 F.2d 210 (D.C. Cir. 1987) ............................................................... 7, 8, 10

*Kissinger v. Reporters Comm. for Freedom of the Press,*
  445 U.S. 136 (1980) ..................................................................................... 6

*Larson v. Dep't of State,*
  565 F.3d 857 (D.C. Cir. 2009) ............................................................... 8, 9, 14

*Liberation Newspaper v. Dep't of State,*
  80 F. Supp. 3d 137 (D.D.C. 2015) ..................................................................... 5

*Mapother v. DOJ*,
   3 F.3d 1533 (D.C. Cir. 1993)...................................................................... 16

*Marrera v. DOJ*,
   622 F. Supp. 51 (D.D.C. 1985)................................................................... 13

*Mayer Brown LLP v. IRS*,
   562 F.3d 1190 (D.C. Cir. 2009)................................................................. 18

*McClanahan v. DOJ*,
   204 F. Supp. 3d 30 (D.D.C. 2016)............................................................ 24

*Military Audit Project v. Casey*,
   656 F.2d 724 (D.C. Cir. 1981)............................................................. 7, 21

*Minier v. CIA*,
   88 F.3d 796 (9th Cir. 1996) ......................................................................... 6

*Moore v. CIA*,
   666 F.3d 1330 (D.C. Cir. 2011)................................................................. 21

*Morley v. CIA*,
   508 F.3d 1108 (D.C. Cir. 2007)................................................................. 14

*Muttitt v. Dep't of State*,
   926 F. Supp. 2d 284 (D.D.C.2013).............................................................. 5

*NLRB v. Robbins Tire & Rubber Co.*,
   437 U.S. 214 (1978) ............................................................................ 16, 18

*Parker v. EOUSA*,
   852 F. Supp. 2d 1 (D.D.C. 2012)................................................................. 9

*People for the Ethical Treatment of Animals v. NIH*,
   745 F.3d 535 (D.C. Cir. 2014)................................................................... 17

*PHE, Inc. v. DOJ*,
   983 F.2d 248 (D.C. Cir. 1993)................................................................... 18

*Phillippi v. CIA*,
   546 F.2d 1009 (D.C. Cir. 1976)............................................................... 3, 9

*Pub. Citizen v. Dep't of State*,
   11 F.3d 198 (D.C. Cir. 1993)..................................................................... 20

*Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n,*
   *U.S.-Mexico*, 740 F.3d 195 (D.C. Cir. 2014)...................................... 15, 19

*Ray v. Turner*,
    587 F.2d 1187 (D.C. Cir. 1978)............................................................................. 8

*SafeCard Servs., Inc. v. SEC*,
    926 F.2d 1197 (D.C. Cir. 1991)............................................................................. 7

*Schwarz v. Dep't of Treasury*,
    131 F. Supp. 2d 142 (D.D.C. 2000)....................................................................... 13

*Talbot v. CIA*,
    578 F. Supp. 2d 24 (D.D.C. 2008)........................................................................ 14

*Unrow Human Rights Litig. Clinic v. Dep't of State*,
    134 F. Supp. 3d 263 (D.D.C. 2015)................................................................. 8, 10

*Wheeler v. CIA*,
    271 F. Supp. 2d 132 (D.D.C. 2003)........................................................................ 9

*Wilner v. NSA*,
    592 F.3d 60 (2d Cir. 2009) ............................................................................. 9, 13

*Wolf v. CIA*,
    473 F.3d 370 (D.C. Cir. 2007)................................................................... 9, 20, 21

## **Statutes**

5 U.S.C. § 552(a)(4)(B) ........................................................................................ 6, 7

5 U.S.C. § 552(a)(6)(E)(iv) ....................................................................................... 5

5 U.S.C. § 552(b) ...................................................................................................... 6

5 U.S.C. § 552(b)(1) ............................................................................................... 10

5 U.S.C. § 552(b)(3)(A) ......................................................................................... 13

5 U.S.C. § 552(b)(7) ............................................................................................... 15

5 U.S.C. § 552(b)(7)(A) ......................................................................................... 15

5 U.S.C. § 552(b)(7)(E) .......................................................................................... 18

*National Security Act of 1947*,
    50 U.S.C. § 3024(i)(1).......................................................................................... 14

## **Regulations**

28 C.F.R. § 16.4(a)................................................................................................. 23

**Other Authorities**

Exec. Order No. 13, 526,
   75 Fed. Reg. 707 (Dec. 29, 2009).................................................................................. 3, 10, 11

H.R. Rep. No. 89-1497 (1966),
   *reprinted in* 1966 U.S.C.C.A.N. 2418.........................................................................................6

Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian
   Interference in the 2016 U.S. Election, March 20, 2017,
   https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-transcript-fbi-
   director-james-comey-testifies-on-russian-interference-in-2016-
   election/?utm_term=.b9f19a0cf9cf (last accessed
   9/1/2017)....................................................................................................................................4, 23

## **INTRODUCTION**

Under the Freedom of Information Act, Plaintiff American Oversight seeks information from the United States Department of Justice National Security Division and the Federal Bureau of Investigation about electronic surveillance activity allegedly related to an ongoing investigation.  More specifically, Plaintiff seeks warrant applications for telecommunications intercepts in connection with presidential candidate Donald Trump, Trump Tower, or the Trump campaign, as well as related court orders, logs, and Congressional briefings.  Defendants United States Department of Justice and the Federal Bureau of Investigation have properly refused to confirm or deny the existence of responsive records, and no authorized Executive Branch official has disclosed the specific information at issue – namely, the existence or non-existence of a specific kind of surveillance related to particular individuals allegedly related to an ongoing investigation.  This information is currently and properly classified, and otherwise exempt, and the Government's previous confirmation that a limited subset of such documents do not exist does not waive the Glomar response provided here.

The Government's supporting declarations establish that providing a substantive response would reveal classified information protected by Freedom of Information Act ("FOIA") Exemption 1, the disclosure of which would cause harm to national security.  The FBI's declaration further establishes that disclosure of the existence or non-existence of responsive records would reveal intelligence sources and methods protected by Exemption 3 and the National Security Act, as well as law enforcement information protected by Exemptions 7(A) and 7(E).  The Court should defer to Defendants' determination in this regard.

Finally, because Plaintiff also sought "processing records", Defendants also properly confirmed that there were no processing records within the relevant timeframe.   Accordingly, the Government is entitled to summary judgment.

## BACKGROUND

### I.   Administrative Background

This matter arises from identical FOIA requests submitted to the Federal Bureau of Investigation ("FBI") and DOJ National Security Division ("NSD").  Those requests seek:

1)      All warrant applications or other records requesting a court to institute an intercept of telecommunications or a pen register trap and trace on electronic communications or telecommunications in connection with presidential candidate Donald Trump, Trump Tower (located at 725 5th Avenue, New York, NY), entities housed in Trump Tower, or any person affiliated with Mr. Trump's campaign, whether paid or unpaid, between June 16, 2015, and the present, whether under the authority of the Foreign Intelligence Surveillance Act [FISA]; Title III of the Omnibus Crime Control and Safe Streets Act of 1968m as amended; or other authority.

2)      Any court order or other document providing authority to institute or maintain such a requested wiretap, intercept, or pen register.

3)      Any court order or other document rejecting such an application or request for authority for a wiretap, intercept, or pen register.

4)      Any records logging or listing any such wiretaps, intercepts, or pen registers.

5)      All communications, documents, or other material exchanged between DOJ or the FBI and Congress, or briefing papers or talking points prepared for congressional briefings, regarding the wiretaps, intercepts, or pen registers discussed, or records described, in Items 1-4, supra.

*See* Declaration of David Hardy, dated September 1, 2017, ¶ 5 & Ex. A; Declaration of G. Bradley Weinsheimer, dated August 31, 2017, ¶ 4 & Ex. A.  Plaintiff also sought "records describing the processing of this request" and limited the dates of the search "from June 1, 2015 to the date the search is conducted."  *Id*.  Plaintiff further requested expedited processing and a fee waiver.  *Id*.

By email dated April 3, 2017, NSD refused to confirm or deny the existence of responsive records, explaining that it does not search for records in response to requests regarding the use or non-use of certain foreign intelligence gathering techniques in which the confirmation or denial of the existence of responsive records would, in and of itself, reveal information properly classified under Executive Order 13526.  *See* Weinsheimer Decl. ¶ 5 & Ex. B.  This is known as a "Glomar" response, and is proper if the fact of the existence or non-existence of agency records falls within a FOIA exemption.  *See Phillippi v. CIA*, 546 F.2d 1009, 1011 (D.C. Cir. 1976) (acknowledging CIA refusal to confirm or deny existence of records regarding activities of a ship named Hughes Glomar Explorer).  Plaintiff appealed NSD's determination to the Department of Justice's Office of Information Policy ("OIP"), by letter dated April 12, 2017.  *See id*. & Exhibit C.  OIP affirmed NSD's determination in a letter dated, April 13, 2017.  *See id*. & Exhibit D.

FBI acknowledged Plaintiff's request by letter dated April 11, 2017.  Hardy Decl. ¶¶ 9-11.  FBI had not yet made a final determination at the time Plaintiff filed suit on April 19, 2017. The Complaint makes claims for wrongful denial of expedited processing, failure to conduct an adequate search, and wrongful withholding of records.

## II.    Factual Background.

Plaintiff's FOIA requests arise in a factual context in which there is an ongoing, acknowledged official investigation related to the Trump campaign.  Specifically, the FBI has acknowledged a counterintelligence investigation of "the Russian government's efforts to interfere in the 2016 presidential election[, including] the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts[, and] an assessment of whether any

crimes were committed." *See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Election, March 20, 2017, https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-interference-in-2016-election/?utm_term=.b9f19a0cf9cf (last accessed 9/1/2017); Hardy Decl. ¶ 21.  That investigation is now under the direction of Special Counsel Robert Mueller.  *Id.* ¶ 46.

Plaintiff claims that the FOIA request was prompted by certain statements of the President.  In particular, President Trump's Twitter account made a four-part post on March 4, 2017:

- "Terrible! Just found out that Obama had my "wires tapped" in Trump Tower just before the victory. Nothing found. This is McCarthyism!"

- "Is it legal for a sitting President to be "wire tapping" a race for president prior to an election? Turned down by court earlier. A NEW LOW!"

- "I'd bet a good lawyer could make a great case out of the fact that President Obama was tapping my phones in October, just prior to Election!"

- "How low has President Obama gone to tapp [*sic*] my phones during the very sacred election process. This is Nixon/Watergate. Bad (or sick) guy!"

Available at https://twitter.com/realDonaldTrump.

During sworn testimony before the House Permanent Selection Committee on Intelligence ("HPSCI") on March 20, 2017, then FBI Director James B. Comey was asked about this by Congressman Schiff and responded:

> With respect to the President's tweets about alleged wiretapping directed at him by the prior administration, I have no information that supports those tweets and we have looked carefully inside the FBI. The Department of Justice has asked me to share with you

4

> that the answer is the same for the Department of Justice and all its
> components. The Department has no information that supports
> those tweets.

*See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian

Interference in the 2016 U.S. Election, March 20, 2017; Hardy Decl. ¶ 13.  Other than this public

statement by then-Director Comey addressing this specific statement, neither the FBI nor DOJ

have publicly commented on or acknowledged the existence or non-existence of any FISA, Title

III, or other wiretaps "in connection with presidential candidate Donald Trump, Trump Tower

(located at 725 5th Avenue, New York, NY), entities housed in Trump Tower, or any person

affiliated with Mr. Trump's campaign, whether paid or unpaid, between June 16, 2015 and the

present."  Hardy Decl. ¶ 14.

In light of these statements, both FBI and NSD can again confirm that they have no

records related to wiretaps as described by the March 4, 2017 tweets.  Hardy Decl. ¶ 15;

Weinsheimer Decl. ¶ 8.[1]  Because Plaintiff's request is broader than the category of alleged

wiretaps described in those statements, however, FBI and DOJ do not confirm or deny the

existence of any other responsive records.  Hardy Decl. ¶¶ 16, 56; Weinsheimer Decl. ¶ 9.[2]

---

[1] The Hardy Declaration indicates that FBI consulted with personnel knowledgeable about Director Comey's statements and the surveillance activities of the FBI and again confirmed that there are no such records at FBI.  Hardy Decl. ¶ 15.

[2] To the extent Plaintiff is pressing its claim for denial of expedited processing, that claim is now moot. This Court lacks jurisdiction over plaintiff's claim for wrongful denial of expedition because DOJ has completed its processing of plaintiff's FOIA request.  *See* 5 U.S.C. § 552(a)(6)(E)(iv) (a court lacks subject matter jurisdiction "to review an agency denial of expedited processing of a request for records after the agency has provided a complete response to the request."); *see also Muttitt v. Dep't of State*, 926 F. Supp. 2d 284, 296 (D.D.C.2013); *Liberation Newspaper v. Dep't of State*, 80 F. Supp. 3d 137, 140 (D.D.C. 2015); *CREW v. DOJ*, 535 F. Supp. 2d 157, 160 n.1 (D.D.C. 2008).

## ARGUMENT

### I.    STATUTORY STANDARDS

### A.    The Freedom of Information Act

The "basic purpose" of FOIA reflects a "general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language." *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989).  "Congress recognized, however, that public disclosure is not always in the public interest."  *CIA v. Sims*, 471 U.S. 159, 166–67 (1985). Accordingly, in passing FOIA, "Congress sought 'to reach a workable balance between the right of the public to know and the need of the Government to keep information in confidence to the extent necessary without permitting indiscriminate secrecy.'"  *John Doe Agency*, 493 U.S. at 152 (quoting H.R. Rep. No. 89-1497, at 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423).  As the D.C. Circuit has recognized, "FOIA represents a balance struck by Congress between the public's right to know and the [G]overnment's legitimate interest in keeping certain information confidential."  *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 925 (D.C. Cir. 2003) (citing *John Doe Agency*, 493 U.S. at 152).

FOIA mandates disclosure of government records unless the requested information falls within one of nine enumerated exemptions.  *See* 5 U.S.C. § 552(b).  "A district court only has jurisdiction to compel an agency to disclose improperly withheld agency records," *i.e.* records that do "not fall within an exemption."  *Minier v. CIA*, 88 F.3d 796, 803 (9th Cir. 1996); *see also* 5 U.S.C. § 552(a)(4)(B) (providing the district court with jurisdiction only "to enjoin the agency from withholding agency records and to order the production of any agency records improperly withheld from the complainant"); *Kissinger v. Reporters Comm. for Freedom of the Press,* 445 U.S. 136, 150 (1980) ("Under 5 U.S.C. § 552(a)(4)(B)[,] federal jurisdiction is dependent upon a

showing that an agency has (1) 'improperly'; (2) 'withheld'; (3) 'agency records.'").  While narrowly construed, FOIA's statutory exemptions "are intended to have meaningful reach and application." *John Doe Agency*, 493 U.S. at 152; *accord DiBacco v.U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015).

The courts resolve most FOIA actions on summary judgment.  *See Judicial Watch, Inc. v. Dep't of the Navy*, 25 F. Supp. 3d 131, 136 (D.D.C. 2014).  The Government bears the burden of proving that the withheld information falls within the exemptions it invokes.  *See* 5 U.S.C. § 552(a)(4)(B); *King v. DOJ*, 830 F.2d 210, 217 (D.C. Cir. 1987).  A court may grant summary judgment to the Government based entirely on an agency's declarations, provided they articulate "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981); *accord Gov't Accountability Project v. Food & Drug Admin.*, 206 F. Supp. 3d 420, 430 (D.D.C. 2016).  Such declarations are accorded "a presumption of good faith, which cannot be rebutted by purely speculative claims[.]" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

**B.      Special Considerations in National Security Cases**

The issues presented in this case directly "implicat[e] national security, a uniquely executive purview." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926–27.  While courts review *de novo* an agency's withholding of information pursuant to a FOIA request, "*de novo* review in FOIA cases is not everywhere alike." *Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987).  Indeed, the courts have specifically recognized the "propriety of deference to the executive in the context of FOIA claims which implicate national

security." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927–28; *see Ray v. Turner*, 587 F.2d 1187, 1193 (D.C. Cir. 1978) ("[T]he executive ha[s] unique insights into what adverse [e]ffects might occur as a result of public disclosure of a particular classified record."). "[A]ccordingly, the government's 'arguments needs only be both "plausible" and "logical" to justify the invocation of a FOIA exemption in the national security context.'" *Unrow Human Rights Litig. Clinic v. Dep't of State*, 134 F. Supp. 3d 263, 272 (D.D.C. 2015) (quoting *ACLU v. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011)).

For these reasons, the courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927; *see Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) ("Today we reaffirm our deferential posture in FOIA cases regarding the 'uniquely executive purview' of national security."); *accord Unrow Human Rights Impact Litig. Clinic*, 134 F. Supp. 3d at 272. Consequently, a reviewing court must afford "substantial weight" to agency declarations "in the national security context." *King*, 830 F.2d at 217; *see Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (holding that the district court erred in "perform[ing] its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure . . . ."); *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) (because "courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns" about the harm that disclosure could cause to national security). FOIA "bars the courts from prying loose from the government even the smallest bit of information that is properly classified or would disclose intelligence sources or methods." *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

**C.     The Glomar Response.**

A Glomar response allows the Government to "refuse to confirm or deny the existence of records where to answer the FOIA inquiry would cause harm cognizable under an FOIA exception." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982)); *accord Wilner v. NSA*, 592 F.3d 60, 68 (2d Cir. 2009) ("The Glomar doctrine is well settled as a proper response to a FOIA request because it is the only way in which an agency may assert that a particular FOIA statutory exemption covers the 'existence or non-existence of the requested records[.]'" (quoting *Phillippi v. CIA*, 546 F.2d 1009, 1012 (D.C. Cir. 1976)).  In support of a Glomar response, the asserting agency "must explain why it can neither confirm nor deny the existence of responsive records." *James Madison Project v. Dep't of Justice*, 208 F. Supp. 3d 265, 283 (D.D.C. 2016) (quoting *Parker v. EOUSA*, 852 F. Supp. 2d 1, 10 (D.D.C. 2012)).  The agency can satisfy this obligation by providing "public affidavit[s] explaining in as much detail as is possible the basis for its claim that it can be required neither to confirm nor to deny the existence of the requested records." *Phillippi*, 546 F.2d at 1013.

The courts in this Circuit have consistently upheld Glomar responses where, as here, confirming or denying the existence of records would reveal classified information protected by FOIA Exemption 1 or disclose information protected by statute in contravention of FOIA Exemption 3.  *See, e.g.*, *Frugone*, 169 F.3d at 774–75 (finding that CIA properly refused to confirm or deny the existence of records concerning the plaintiff's alleged employment relationship with CIA pursuant to Exemptions 1 and 3); *Larson*, 565 F.3d at 861–62 (upholding the National Security Agency's use of the Glomar response to the plaintiffs' FOIA requests regarding past violence in Guatemala pursuant to Exemptions 1 and 3); *Wheeler v. CIA*, 271 F.

Supp. 2d 132, 140 (D.D.C. 2003) (ruling that CIA properly invoked a Glomar response to a request for records concerning the plaintiff's activities as a journalist in Cuba during the 1960s pursuant to Exemption 1).

## II.    NSD and FBI Properly Refused to Confirm or Deny the Existence of Other Responsive Records Pursuant to Exemption One.

FOIA Exemption 1 exempts from disclosure information that is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and "are in fact properly classified pursuant to such Executive Order." 5 U.S.C. § 552(b)(1).  Under Executive Order 13,526, an agency may withhold information that an official with original classification authority has determined to be classified because its "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security[.]"  Exec. Order No. 13,526 § 1.4, 75 Fed. Reg. 707, 709 (Dec. 29, 2009).  The information must also "pertain[] to" one of the categories of information specified in the Executive Order, including "intelligence activities (including covert action), intelligence sources or methods," and "foreign relations or foreign activities of the United States. . . ."  Exec. Order 13,526 §§ 1.4(c), (d); *see also Judicial Watch, Inc. v. DOD*, 715 F.3d 937, 941 (D.C. Cir. 2013) ("[P]ertains is not a very demanding verb.").  As addressed above, when it comes to matters affecting national security, the courts afford "substantial weight" to an agency's declarations addressing classified information, *King*, 830 F.2d at 217, and defer to the expertise of agencies involved in national security and foreign relations.  *See Fitzgibbon*, 911 F.2d at 766; *see also Unrow Human Rights Impact Litig. Clinic*, 134 F. Supp. 3d at 272.

Defendants invoked their Glomar responses in order to safeguard currently and properly classified information involving categories of information set forth in Section 1.4 of Executive Order 13,526.  *See* Hardy Decl. ¶¶ 20, 28-37; Weinsheimer Decl. ¶¶ 10-17.  First, the existence

or non-existence of responsive records implicates "intelligence activities (including covert action), intelligence sources or methods, or cryptology." Exec. Order 13,526 §1.4(c).  The supporting declarations establish that disclosing whether or not the defendant agencies possessed responsive records would disclose the existence or non-existence of surveillance records related to a particular individual or organization, including in the course of an ongoing national security investigation.  *See* Hardy Decl. at ¶¶ 28, 33; Weinsheimer Decl. at ¶ 13.  Moreover, during the date range specified by the request, NSD only maintains surveillance records pursuant to the Foreign Intelligence Surveillance Act.  Weinsheimer Decl. ¶ 11.  Surveillance authorized by the FISC under any of its authorities is itself an intelligence method, and its use in any particular matter thus "pertains to" an intelligence source or method.  *Cf. Clapper v. Amnesty Int'l USA,* 568 U.S. 398 (2013) (describing FISA authorities).

Second, the Hardy Declaration confirms that the existence or non-existence of responsive records implicates "foreign relations or foreign activities of the United States, including confidential sources." Exec. Order 13,526 § 1.4(d).  Verifying whether or not the defendant agencies possessed responsive records would tend to reveal a specific type of counterintelligence activity with respect to one or more foreign governments.  Hardy Decl. ¶¶ 19, 34-37.

The supporting declarations demonstrate that confirming whether or not Defendants possessed responsive records reasonably could be expected to cause damage to the national security of the United States by disclosing the existence or non-existence of intelligence sources and methods.  *See* Hardy Decl. at ¶ 20, 30-33; Weinsheimer Decl. at ¶¶ 13-14.  As explained in the Hardy Declaration, "acknowledging the existence or non-existence of records responsive to Plaintiffs' request would be tantamount to confirming whether or not the FBI has relied on a particular intelligence activity or method targeted at particular individuals or organizations" and

"would reveal otherwise non-public information regarding the nature of the FBI's intelligence interests, priorities, activities, and methods—information that is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission."  Hardy Decl.  ¶ 33.  "Once an intelligence activity or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized."  Hardy Decl. ¶ 31; *see* Weinsheimer Decl. ¶¶ 5, 14-17.  Moreover, U.S. adversaries review publicly available information to deduce intelligence methods, catalogue information, and take countermeasures, and disclosure of the existence or non-existence of responsive records would reasonably be expected to harm national security.  *See* Hardy Decl. ¶ 32.

Further, the Hardy Declaration establishes that confirming the existence or non-existence of responsive documents would reveal information about the United States Government's foreign relations, the disclosure of which could cause damage to national security.  Hardy Decl. ¶¶ 34-37.  Such disclosure could "weaken, or even sever, the relationship between the United States and its foreign partners (present and future), thus degrading the Government's ability to combat hostile threats abroad," and "any confirmation of records could be interpreted by some to mean that certain foreign liaison partners were involved in espionage against the United States, which could have political implications in those and other countries and also make them less willing to cooperate with the U.S. Government in the future."  *Id.*[3]

The Government routinely makes a Glomar response to similar requests for information about particular surveillance subjects, and Courts routinely uphold such responses.  *See, e.g., Marrera v. DOJ*, 622 F. Supp. 51, 53–54 (D.D.C. 1985) ("[T]his Court finds that OIPR's refusal

---

[3] To the extent possible on the public record, the declarations explain the harm to national security that would result from disclosure of the properly classified information at issue here.  If the Court finds that explanation inadequate, Defendants could offer further explanation *ex parte* and *in camera*.

to confirm or deny the existence of FISA records pertaining to this particular plaintiff to be justified in the interests of national security as part of an overall policy of [the Executive Order] with respect to all FISA FOIA requests."); *Schwarz v. Dep't of Treasury*, 131 F. Supp. 2d 142, 149 (D.D.C. 2000) ("The Office properly refused to confirm or deny that it had any responsive records maintained under the Foreign Intelligence Surveillance Act of 1978 (FISA) and in non-FISA files relating to various intelligence techniques."), aff'd, No. 00-5453, 2001 WL 674636 (D.C. Cir. May 10, 2001); *Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d 45, 60 (D.D.C. 2015) (upholding NSA Glomar response to request for metadata records with respect to two particular individuals); *Agility Pub. Warehousing Co. K.S.C. v. NSA*, 113 F. Supp. 3d 313, 329 (D.D.C. 2015) (upholding NSA Glomar in response to request for particular surveillance records); s*ee also Wilner*, 592 F.3d at 65 ("Glomar responses are available, when appropriate, to agencies when responding to FOIA requests for information obtained under a publicly acknowledged intelligence program, such as the TSP, at least when the existence of such information has not already been publicly disclosed.").

Accordingly, the Glomar response was proper under Exemption One.

## III.    The Glomar Response Was Proper Under Exemption Three and the National Security Act.

FOIA Exemption 3 exempts from disclosure records that are "specifically exempted from disclosure by [another] statute" if the relevant statute "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" or "establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3)(A). The Government's mandate to withhold information under FOIA Exemption 3 is broader than its authority under FOIA Exemption 1, as it does not have to demonstrate that the disclosure will harm national security. *See Sims*, 471 U.S. at 167; *Gardels*, 689 F.2d at 1106–07.

Instead, "the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within the statute's coverage.  It is particularly important to protect intelligence sources and methods from public disclosure."  *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir. 2007).  In analyzing the propriety of a withholding made pursuant to FOIA Exemption 3, the Court need not examine "the detailed factual contents of specific documents[.]"  *Id.*

Defendant FBI invokes Section 102A(i)(1) of the National Security Act of 1947, as amended (now codified at 50 U.S.C. § 3024(i)(1)) ("NSA"), which requires the Director of National Intelligence to "protect intelligence sources and methods from unauthorized disclosure."[4]  It is well-established that Section 102A qualifies as a withholding statute for the purposes of FOIA Exemption 3.  *See, e.g.*, *ACLU v. DOD*, 628 F.3d at 619.  In fact, the Supreme Court has recognized the "wide-ranging authority" provided by the NSA to protect intelligence sources and methods.  *See Sims*, 471 U.S. at 169–70, 177, 180; *see Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980) (explaining that the only question for the court is whether the agency has shown that responding to a FOIA request "could reasonably be expected to lead to unauthorized disclosure of intelligence sources and methods").  The NSA has been properly invoked to withhold information about FISA and other surveillance techniques. *See, e.g., Agility Pub. Warehousing Co. K.S.C.*, 113 F. Supp. 3d at 329

The Hardy Declaration attests that Defendants have properly invoked the Glomar response to protect classified information under the NSA and FOIA Exemption 3.  *See* Hardy Decl. at ¶¶ 38-40.  For the reasons discussed above with regard to Exemption 1, confirming the existence or non-existence of responsive records could divulge information about the existence

---

[4] The courts have recognized that not just the Director of National Intelligence, but also other agencies may rely upon the amended NSA to withhold records under FOIA.  *See, e.g., Larson*, 565 F.3d at 862–63, 865; *Talbot v. CIA*, 578 F. Supp. 2d 24, 28–29 n.3 (D.D.C. 2008).

or non-existence of intelligence sources and methods protected from disclosure under the NSA. *Id.* ¶¶ 33, 39-40.  Indeed, the declaration explains that a substantive response to Plaintiffs' request could reveal whether or not the United States Government has intelligence sharing relationships with foreign liaison partners.  *See id.* ¶ 37.  Accordingly, the FBI has demonstrated the appropriateness of the Glomar response under FOIA Exemption 3.

## IV.   The Glomar Response Was Proper Under Exemption 7(A).

FOIA Exemption 7 protects from disclosure all "records or information compiled for law enforcement purposes" that could reasonably be expected to cause one of the six harms outlined in the Exemption's subparts.  5 U.S.C. § 552(b)(7).  "To fall within any of the exemptions under the umbrella of Exemption 7, a record must have been 'compiled for law enforcement purposes.'" *Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 202 (D.C. Cir. 2014) (quoting 5 U.S.C. § 552(b)(7)). "According to the Supreme Court, the term 'compiled' in Exemption 7 requires that information be created, gathered, or used by an agency for law enforcement purposes at some time before the agency invokes the exemption."  *Id*. at 203.

Exemption 7(A) "exempts from disclosure 'records or information compiled for law enforcement purposes . . . to the extent that the production of [the] records or information . . . could reasonably be expected to interfere with enforcement proceedings.'" *Citizens for Responsibility & Ethics in Wash. v. DOJ,* 746 F.3d 1082, 1096 (D.C. Cir. 2014) (hereinafter "*CREW*") (quoting 5 U.S.C. § 552(b)(7)(A)).  "Exemption 7(A) reflects the Congress's recognition that 'law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case.'"  *Id* (quoting *NLRB v. Robbins Tire & Rubber Co.*,

437 U.S. 214, 224 (1978)).  "To justify withholding, [an agency] must therefore demonstrate that 'disclosure (1) could reasonably be expected to interfere with (2) enforcement proceedings that are (3) pending or reasonably anticipated.'"  *Id.* (quoting *Mapother v. DOJ*, 3 F.3d 1533, 1540 (D.C. Cir. 1993)).

An ongoing investigation typically triggers Exemption 7(A).  *See CREW*, 746 F.3d at 1098 (quoting *Juarez v. Dep't of Justice*, 518 F.3d 54, 59 (D.C. Cir. 2008)).  "In the typical case," therefore, "the requested records relate to a specific individual or entity that is the subject of the ongoing investigation, making the likelihood of interference readily apparent."  *Id.*

Here, the Hardy Declaration justifies the FBI's use of Exemption 7(A) to protect the currently undisclosed fact of the existence or non-existence of investigative records that would be responsive to Plaintiff's requests.   As an initial matter, FBI records related to surveillance are plainly compiled for law enforcement purposes.  As the Hardy Declaration establishes, the "only circumstance under which the FBI can request – and the Department of Justice can and would seek on the FBI's behalf – a FISA, Title III, or other surveillance order is when the FBI is conducting an authorized, predicated investigation within the scope of its law enforcement and, with respect to FISA, its foreign intelligence responsibilities.  Hardy Decl. ¶ 43.   Accordingly, surveillance records – when they exist – are records compiled for law enforcement purposes.

Additionally, the information requested purportedly relates to an ongoing investigation because, as discussed above, there is a publicly acknowledged investigation into Russian interference in the election.  Hardy Decl. ¶ 46.  Any sort of investigation involving such surveillance records would be the sort of active investigation protected by Exemption 7(A).  *See, e.g.*, *People for the Ethical Treatment of Animals v. NIH*, 745 F.3d 535, 541 (D.C. Cir. 2014) (Exemption 7's threshold requirement satisfied in a *Glomar* response case because FOIA

requester did not dispute that "any responsive documents," if they existed, "would constitute records or information compiled for law enforcement purposes").

The Hardy Declaration further describes the harm to an investigation that may result:

> Confirming or denying the existence or non-existence of responsive records would reveal non-public information about the focus, scope, and conduct of that investigation. Specifically, it would reveal whether or not specific investigative techniques have been used; when and to what extent they were used, if they were; their relative value or benefit if they were used; and the targets they were used against, if any. None of this information about the Russian interference investigation has been publicly disclosed and prematurely disclosing it here would give targets and others intent on interfering with the FBI's investigative efforts the information necessary to: take defensive actions to conceal criminal activities; develop and implement countermeasures to elude detection; suppress, destroy, or fabricate evidence; and identify potential witnesses or sources, exposing them to harassment, intimidation, coercion, and/or physical threats. Accordingly, to the extent that Plaintiff's request seeks records in relation to this investigation, confirming or denying the existence or non-existence of responsive records could reasonably be expected to adversely affect it.

Hardy Decl. ¶ 47. Moreover, to the extent the request implicates some investigation other than that alleged by Plaintiffs, revealing such an investigation prematurely would cause the same type of harm. *Id.* ¶ 48. Accordingly, a Glomar response is available under these circumstances to protect the integrity of confidential law-enforcement investigations, and to therefore prevent harm cognizable by FOIA Exemption 7(A). *See, e.g.*, *Cozen O'Connor v. Dep't of Treasury*, 570 F. Supp. 2d 749, 788 (E.D. Pa. 2008); *see also CREW*, 746 F.3d at 1096 ("Exemption 7(A) reflects the Congress's recognition that 'law enforcement agencies ha[ve] legitimate needs to keep certain records confidential, lest the agencies be hindered in their investigations or placed at a disadvantage when it [comes] time to present their case.'" (quoting *Robbins Tire*, 437 U.S. at 224)).

For these reasons, the FBI's Glomar response is justified by Exemption 7(A).

17

## V.     The Glomar Response Was Proper Under Exemption 7(E)

Exemption 7(E) authorizes withholding of information compiled for law enforcement purposes if release of the information "would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law."  5 U.S.C. § 552(b)(7)(E).  Congress intended that Exemption 7(E) protect law enforcement techniques and procedures from disclosure, as well as techniques and procedures used in all manner of investigations after crimes or other incidents have occurred. *See, e.g.*, *PHE, Inc. v. DOJ*, 983 F.2d 248, 250–51 (D.C. Cir. 1993).  "[T]he exemption is written in broad and general terms" to avoid assisting lawbreakers.  *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009).

The terms of the statute provide that, to withhold records that would reveal law enforcement "guidelines," an agency must show that "disclosure could reasonably be expected to risk circumvention of the law."  It is not clear whether this requirement also applies to withholding of records that would reveal "techniques and procedures."  *See CREW*, 746 F.3d at 1102 n.8.  However, the D.C. Circuit has stressed that the risk-of-circumvention requirement sets a "low bar."  *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011); *accord Gosen v. USCIS*, 75 F. Supp. 3d 279, 291 (D.D.C. 2014) (describing the risk-of-circumvention requirement as a "low bar").  Given the low threshold for meeting the risk-of-circumvention requirement, and given that disclosure of law enforcement techniques and procedures usually has obvious potential to create a risk of circumvention, it generally makes little practical difference whether the risk-of-circumvention requirement applies to all of Exemption 7(E) or only the part dealing with

"guidelines." *See Pub. Emps. for Envtl. Responsibility*, 740 F.3d at 204 n.4.  In any event, FBI's

Glomar response under Exemption 7(E) meets the requirement if it applies.

Here, the Hardy Declaration establishes that disclosure of existence or non-existence of

responsive records would reveal a law enforcement technique or procedure.  "How the FBI

applies its investigative resources (or not) against a particular allegation, report of criminal

activity, or perceived threat is itself a law enforcement technique or procedure that the FBI

protects."  Hardy Decl. ¶ 51.  Such an acknowledgment of the existence or non-existence of

responsive records would reveal when and under what circumstances the FBI relies upon these

authorized law enforcement techniques (*i.e.*, FISA, Title III, or other authorized surveillance) in

an investigation against particular targets in an investigation, and provide pieces of information

that adversaries could use to ascertain at what point, and against whom we might use particular

techniques.  Hardy Decl. ¶¶ 51-52.  Adversaries could glean significant "insight into the

activities likely to attract – or not attract – the FBI's law enforcement attention.  These

individuals would then be able alter their behavior to avoid attention by law enforcement,

making it more difficult for the FBI to be proactive in assessing threats and investigating

crimes."  *Id.*  Accordingly, the FBI properly invoked Exemption 7(E).

## VI.   Defendants Have Not Officially Acknowledged the Existence or Non-Existence of Responsive Records

As a general matter, under FOIA, "when an agency has officially acknowledged

otherwise exempt information through prior disclosure, the agency has waived its right to claim

an exemption with respect to that information."  *ACLU v. CIA*, 710 F.3d 422, 426 (D.C. Cir.

2013).  This "official acknowledgement" principle applies to the Glomar context, so a requester

"can overcome a Glomar response by showing that the agency has already disclosed the fact of

the existence (or non-existence) of responsive records, since that is the purportedly exempt

information that a Glomar response is designed to protect." *Id.* at 427.  But the plaintiff "must

bear the initial burden of pointing to specific information in the public domain that appears to

duplicate that being withheld." *Id.* (quoting *Wolf*, 473 F.3d at 378).

The D.C. Circuit has narrowly construed the "official acknowledgment" doctrine,

however, and to bring such a challenge plaintiff must satisfy three stringent criteria, none of

which are satisfied here.  "First, the information requested must be as specific as the information

previously released." *Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765).  "Prior

disclosure of similar information does not suffice; instead, the *specific* information sought by the

plaintiff must already be in the public domain by official disclosure.  This insistence on

exactitude [by the D.C. Circuit] recognizes 'the Government's vital interest in information

relating to national security and foreign affairs." *Id.* (quoting *Pub. Citizen v. Dep't of State*, 11

F.3d 198, 203 (D.C. Cir. 1993); *Competitive Enter. Inst.*, 78 F. Supp. 3d at 54 ("Plaintiffs in this

case must therefore point to specific information in the public domain establishing that the NSA

has [the claimed information.]").  The information already released must also be of the same

level of generality as the information sought—broadly crafted disclosures, even on the same

general topic, do not waive the Glomar response. *See, e.g.*, *Afshar*, 702 F.2d at 1133 (previous

disclosure that plaintiff had "'created a problem' in U.S.-Iranian relations" was too general to

justify releasing documents detailing the nature of that problem).

"Second, the information requested must match the information previously disclosed."

*Wolf*, 473 F.3d at 378 (quoting *Fitzgibbon*, 911 F.2d at 765).  If there are "substantive

differences" between the two, an official-acknowledgment claim must fail. *ACLU v. DOD*, 628

F.3d at 621.  That is true even if the previous disclosures are on the same topic. *See, e.g.*,

*Competitive Enter. Inst.*, 78 F. Supp. 3d at 57 (a Presidential statement that "the intelligence

community . . . is looking at phone numbers and durations of calls," was not adequately congruent with a request seeking the companies that had provided that data to U.S. intelligence agencies); *Wolf*, 473 F.3d at 379 (holding that CIA could not claim Glomar protection when it had previously read excerpts from materials sought into the record during congressional hearing).

"Third, . . . the information requested must already have been made public through an official and documented disclosure." *Id.* at 378 (quoting *Fitzgibbon*, 911 F.2d at 765). Key to this element is that the source must be *official*; non-governmental releases, or anonymous leaks by government officials or former government officials do not qualify. *See, e.g.*, *ACLU v. DOD*, 628 F.3d at 621-22; *Agility Public Warehousing Co.  K.S.C.*, 113 F. Supp. 3d at 330 n.8; *Competitive Enter. Inst.*, 78 F. Supp. 3d at 55. In other words, "mere public speculation, no matter how widespread," cannot undermine the agency's Glomar prerogative. *Wolf*, 473 F.3d at 378. And Congressional statements also cannot waive Executive Branch classification or other Exemptions. *See Military Audit Project v. Casey*, 656 F.2d 724, 742-745 (D.C. Cir. 1981); *see also Moore v. CIA*, 666 F.3d 1330, 1333 n.4 (D.C. Cir. 2011) ("[W]e do not deem 'official' a disclosure made by someone other than the agency from which the information is being sought.")

Plaintiffs cannot meet their burden of pointing to an official disclosure of the information they seek. The Hardy Declaration and the Weinsheimer Declaration establish that no authorized government official has disclosed the precise information withheld. *See* Hardy Decl. ¶ 19; Weinsheimer Decl. ¶ 18. The Complaint cites a number of public statements that Plaintiff alleges constitute official acknowledgement of properly classified facts. *See* Compl. ¶¶ 9-11,

ECF No. 1.  But these cited public statements do not come close to meeting the standard for official acknowledgement of the information sought by Plaintiff.

Primarily, Plaintiffs appear to rely on President Trump's four-part post on Twitter on March 4, 2017 quoted above.  This series of tweets contains several allegations regarding wiretapping, including that (1) his phones were tapped; (2) at Trump Tower; (3) in October just prior to the election; (4) on the orders of President Obama; and (5) that such actions were comparable to "Nixon/Watergate."  Nowhere do these tweets mention FISA, the FISC, any targets other than President Trump, or the involvement of DOJ or FBI.  Moreover, the statements are limited to a particular time, a particular target, and a particular place, in contrast to Plaintiff's FOIA request.  Thus, the statements are narrower and do not match the information sought in this FOIA request.

The follow-up statements by Mr. Comey as cited in the complaint also do not impair the Glomar response here.  Compl. ¶¶ 10-11.  FBI Director James Comey stated that "With respect to the president's tweets about alleged wiretapping directed at him by the prior administration, I have no information that supports those tweets and we have looked carefully inside the FBI. The Department of Justice has asked me to share with you that the answer is the same for the Department of Justice and all its components."  Hardy Decl. ¶ 13.[5]  Accordingly, to the extent Plaintiff is seeking records that former Director Comey stated do not exist, Defendants have again confirmed that such records do not exist at NSD or FBI.

---

[5] Former Director Comey also testified about the need for continued secrecy in his March 20th testimony before HPSCI, where he discussed why the FBI does not confirm or refute unsourced media reports.  *See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Election, March 20, 2017 (question and answer exchanges between former Director Comey and Representative Trey Gowdy).

As described above, the Glomar response remains appropriate for the broader category of surveillance records sought by Plaintiff.  The Government has not generally confirmed or denied the use of particular electronic surveillance techniques pertaining to particular individuals or organizations, particularly those allegedly related to ongoing national security investigations. This information is currently and properly classified, and otherwise exempt, and the Government's previous confirmation that a limited subset of such documents do not exist does not waive the proper Glomar response.

**VI.     The No-Records Response to the Request for Processing Records Is Appropriate.**

As noted above, the original request sought FOIA processing records from NSD and FBI. *See* Hardy Decl., Ex. A; Weinsheimer Decl., Ex. A.   However, under long-standing DOJ policy, a search for records extends up to the date on which a search begins.  *See* 28 C.F.R. § 16.4(a) ("In determining which records are responsive to a request, a component ordinarily will include only records in its possession as of the date it begins its search.").  However, alternate cut-off dates are permissible.  *Id.*  Here, no search was conducted with respect to the broad wiretap request, so the agencies used the date on which they began working on the request as the alternate cut-off date.  Because, logically, they did not start to create records about the processing of this request until the day it started working on the request, no responsive records existed as of the cut-off date for responsive records in this case.[6]  Hardy Decl.  ¶¶ 54-55; Weinsheimer Decl. ¶ 19.  Accordingly, NSD and FBI reasonably determined that no records would exist in those components.

---

[6] FBI also reviewed its FOIA Document Processing System (FDPS) to ensure that no processing records pre-dating the cut-off date existed in the system, and confirmed that no such records exist.  Hardy Decl. ¶ 55.

Multiple courts in this district have examined the question of whether DOJ's search cut-off dates are reasonable, and "a date-of-search cut-off has routinely been found to be reasonable." *See McClanahan v. DOJ*, 204 F. Supp. 3d 30, 47 (D.D.C. 2016) (collecting cases). The purpose of such rules is to avoid "an endless cycle of judicially mandated reprocessing." *Bonner v. Dep't of State*, 928 F.2d 1148, 1152 (D.C. Cir. 1991); *see also Edmonds Inst. v. Dep't of Interior*, 383 F. Supp. 2d 105, 111 (D.D.C. 2005) ("The D.C. Circuit has all but endorsed the use of date-of-search as the cut-off date for FOIA requests. . . . Under the date-of-search approach, Edmonds can, with relative ease, file a second FOIA request for documents created since December 31, 2002.").

Here, the agencies reasonably determined that no responsive records exist as of the reasonable search cut-off date.

## CONCLUSION

For the foregoing reasons, the Court should grant the Defendants' Motion for Summary Judgment.

Dated:  September 1, 2017                    Respectfully Submitted,

                                            CHAD A. READLER
                                            Acting Assistant Attorney General

                                            ELIZABETH J. SHAPIRO
                                            Deputy Director, Federal Programs Branch

                                            */s/Amy E. Powell*
                                            AMY E. POWELL
                                            Trial Attorney, Federal Programs Branch
                                            Civil Division, Department of Justice
                                            310 New Bern Avenue, Suite 800
                                            Federal Building

Raleigh, NC 27601-1461
Phone: 919-856-4013
Email:  amy.powell@usdoj.gov

## CERTIFICATION OF SERVICE

I hereby certify that the foregoing document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non registered participants by First Class Mail or Federal Express, on the 1st of September, 2017.

/s/Amy E. Powell
AMY POWELL
September 1, 2017