# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| AMERICAN OVERSIGHT, ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> U.S. DEPARTMENT OF JUSTICE et al., ) <br> ) <br> Defendants. ) <br> ) | Civil Action No. 1:17-cv-00718 |

## DECLARATION OF DAVID M. HARDY

I, David M. Hardy, declare as follows:

(1)    I am currently the Section Chief of the Record/Information Dissemination Section (RIDS), Records Management Division (RMD), in Winchester, Virginia. I have held this position since August 1, 2002. Prior to my joining the FBI, from May 1, 2001 to July 31, 2002, I was the Assistant Judge Advocate General of the Navy for Civil Law. In that capacity, I had direct oversight of Freedom of Information Act (FOIA) policy, procedures, appeals, and litigation for the Navy. From October 1, 1980 to April 30, 2001, I served as a Navy Judge Advocate at various commands and routinely worked with FOIA matters. I am also an attorney who has been licensed to practice law in the State of Texas since 1980.

(2)    In my official capacity as Section Chief of RIDS, I supervise approximately 249 employees who staff a total of ten (10) Federal Bureau of Investigation Headquarters ("FBIHQ") units and two (2) field operational service center units whose collective mission is to effectively plan, develop, direct, and manage responses to requests for access to FBI records and information pursuant to the FOIA as amended by the OPEN Government Act of 2007 and the OPEN FOIA Act of 2009; the Privacy Act of 1974; Executive Order 13526; Presidential,

Attorney General, and FBI policies and procedures; judicial decisions; and Presidential and Congressional directives. My responsibilities also include the review of FBI information for classification purposes as mandated by E.O. 13526, 75 Fed. Reg. 707 (2010), and the preparation of declarations in support of Exemption (b)(1) claims under the FOIA. I have been designated by the Attorney General of the United States as an original classification authority, and a declassification authority pursuant to Executive Order 13526 §§ 1.3 and 3.1. The statements contained in this declaration are based upon my personal knowledge, upon information provided to me in my official capacity, and upon conclusions and determinations reached and made in accordance therewith.

(3) Due to the nature of my official duties, I am familiar with the procedures followed by the FBI in responding to requests for information pursuant to the provisions of the FOIA, 5 U.S.C. § 552, and the Privacy Act of 1974, 5 U.S.C. § 552a. Specifically, I am aware of the FBI's handling of Plaintiff's FOIA request that is the subject of this lawsuit.

(4) This declaration is being submitted in support of Defendant's motion for summary judgment.

(5) Plaintiff submitted a request using the FBI's eFOIA portal on March 20, 2017, requesting the following records:

> 1) All warrant applications or other records requesting a court to institute an intercept of telecommunications or a pen register trap and trace on electronic communications or telecommunications in connection with presidential candidate Donald Trump, Trump Tower (located at 725 5th Avenue, New York, NY), entities housed in Trump Tower, or any person affiliated with Mr. Trump's campaign, whether paid or unpaid, between June 16, 2015, and the present, whether under the authority of the Foreign Intelligence Surveillance Act [FISA]; Title III of the Omnibus Crime Control and Safe Streets Act of 1968m as amended; or other authority.
>
> 2) Any court order or other document providing authority to institute

>
> or maintain such a requested wiretap, intercept, or pen register.
>
> 3) Any court order or other document rejecting such an application or request for authority for a wiretap, intercept, or pen register.
>
> 4) Any records logging or listing any such wiretaps, intercepts, or pen registers.
>
> 5) All communications, documents, or other material exchanged between DOJ or the FBI and Congress, or briefing papers or talking points prepared for congressional briefings, regarding the wiretaps, intercepts, or pen registers discussed, or records described, in Items 1-4, *supra*.

(*See* **Exhibit A.**) Hereafter, this portion of Plaintiff's request is collectively referenced as the "wiretap" request.

(6) Plaintiff further requested:

> [R]ecords describing the processing of this request, including records sufficient to identify search terms used and locations and custodians searched and any tracking sheets used to track the processing of this request[,] and ... FOIA questionnaires or certifications completed by individual custodians or components to determine whether they possess responsive materials or to describe how they conducted searches... .

*Id.*

(7) Plaintiff limited its request to "all responsive records from June 1, 2015, to the date the search is conducted." *Id.*

(8) Lastly, Plaintiff requested both expedited processing and a public interest fee waiver.

(9) In a letter dated April 11, 2017, the FBI acknowledged receipt of Plaintiff's FOIA request; assigned it FOIPA Request No. 1371005; denied Plaintiff's request for a public interest fee waiver; and notified Plaintiff of its right to appeal to DOJ's Office of Information Policy ("OIP") within ninety (90) days from the date of the letter or alternatively, seek dispute resolution services by contacting the Office of Government Information Services ("OGIS").

*(See* **Exhibit B.)**

(10) Plaintiff filed this FOIA lawsuit on April 19, 2017. ***See* ECF No. 1, Complaint.**

(11) By letter dated May 2, 2017, the FBI granted Plaintiff's request for expedited processing. *(See* **Exhibit C.)**

## BACKGROUND INFORMATION

(12) President Trump made a four-part post on Twitter on March 4, 2017, alleging that President Obama had his "'wires tapped' in Trump Tower just before the victory."

(13) During sworn testimony before the House Permanent Selection Committee on Intelligence ("HPSCI") on March 20, 2017, then FBI Director James B. Comey was asked about this by Congressman Schiff and responded:

> With respect to the President's tweets about alleged wiretapping directed at him by the prior administration, I have no information that supports those tweets and we have looked carefully inside the FBI. The Department of Justice has asked me to share with you that the answer is the same for the Department of Justice and all its components. The Department has no information that supports those tweets.

*See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Election, March 20, 2017. https://www.washingtonpost.com/news/post-politics/wp/2017/03/20/full-transcript-fbi-director-james-comey-testifies-on-russian-interference-in-2016-election/?utm_term=.b9f19a0cf9cf (last accessed 6/12/2017).

(14) Other than this public statement by then-Director Comey addressing this specific assertion by the President, neither the FBI nor DOJ have publicly commented on or acknowledged the existence or non-existence of any FISA, Title III, or other wiretaps "in connection with presidential candidate Donald Trump, Trump Tower (located at 725 5th Avenue,

New York, NY), entities housed in Trump Tower, or any person affiliated with Mr. Trump's campaign, whether paid or unpaid, between June 16, 2015 and the present."

## WIRETAP REQUEST – NO RECORDS RESPONSE

(15) As the preceding demonstrates, the FBI has no records responsive to Plaintiff's request inasmuch as it seeks records of alleged wiretapping[1] of Trump Tower by President Obama prior to the election, as referenced in the March 4th tweet. *See id.* Out of an abundance of caution, FBI personnel confirmed this by consulting with personnel knowledgeable about Director Comey's statements and the surveillance activities of the FBI and confirmed that no such records exist.

## WIRETAP REQUEST – *GLOMAR* RESPONSE

(16) Plaintiff's request, however, is broader than the subject of the March 4th statement. As to whether any other records exist that are responsive to this portion of Plaintiff's FOIA request, the FBI can neither confirm nor deny the existence or non-existence of other responsive records, as explained below.

(17) The FBI relies on a *Glomar* response in instances in which, assuming that responsive records existed, even acknowledging their existence would result in harm protected against by one or more FOIA exemptions. To be credible and effective, the FBI must use a *Glomar* response in all similar cases regardless of whether responsive records actually exist, including instances in which the FBI does not possess records responsive to a particular request. If the FBI were to invoke a *Glomar* response only when it actually possessed responsive records, the *Glomar* response would be interpreted as an admission that responsive records exist.

---

[1] *I.e.*, warrant applications/requests for court authorization to intercept telecommunications or electronic communications; court orders granting or rejecting such authority; logs; intercepted communications; and briefing materials about such intercepted communications.

(18) Here, the FBI has determined that merely acknowledging the existence or non-existence of records responsive to Plaintiff's wiretap request could trigger harm under FOIA exemptions.

(19) With limited exceptions, the FBI does not and cannot publicly confirm or deny whether or not particular individuals or entities are the subject of Foreign Intelligence Surveillance Court (FISC) orders; that FISC orders have been sought or obtained in the conduct of any particular investigation; or that it has undertaken/is conducting surveillance against specific targets in a pending investigation. I have reviewed the public statements above and those quoted in the Complaint, and none of those statements match the specific information sought in Plaintiff's wiretap request or acknowledge the existence or non-existence of responsive documents. Similarly, no authorized Executive Branch official has acknowledged the existence or non-existence of this specific information – *i.e.*, warrant applications/requests for court authorization to intercept telecommunications or electronic communications; court orders granting or rejecting such authority; logs; intercepted communications; and briefing materials about such intercepted communications.

(20) As an original classification authority, I have determined that the FBI can neither confirm nor deny whether the FBI maintains responsive records because to do so could reasonably be expected to compromise national security and/or reveal intelligence activities, sources, or methods. *See* 5 U.S.C. §§ 552(b)(1), (b)(3).

(21) Moreover, acknowledging or denying the existence or non-existence of records could result in harms protected against by FOIA Exemption (b)(7)(A), 5 U.S.C. § 552(b)(7)(A).

(A) The FBI has acknowledged a counterintelligence investigation of "the Russian government's efforts to interfere in the 2016 presidential election[, including] the nature

of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts[, and] an assessment of whether any crimes were committed." *See* Transcript of the House Permanent Select Committee on Intelligence Hearing on Russian Interference in the 2016 U.S. Election, March 20, 2017. To the extent that Plaintiff's request for wiretap/electronic surveillance records related to, *inter alia*, the Trump campaign seeks records related to the FBI's and Special Counsel's acknowledged Russian Interference investigation, confirming or denying the existence or non-existence of responsive records could reasonably be expected to adversely affect the investigation.

        (B)     Second, to the extent there is an allegation that the FBI is conducting some other investigation in furtherance of which FISC orders were sought or obtained, the FBI has not publicly confirmed or denied any such investigation and assuming such an investigation exists, disclosing its existence here could similarly be expected to adversely affect it.

        (22)    Additionally, acknowledging the existence or non-existence of wiretap/electronic surveillance records – whether pursuant to FISA, Title III, or other legal authority – could reasonably be expected to reveal non-public information about the FBI's use of law enforcement techniques and procedures in a way that risks circumvention of the law. *See* 5 U.S.C. § 552(b)(7)(E).

        (23)    Finally, the FBI cannot confirm or deny the existence or non-existence of briefing/similar materials about the requested wiretap records without disclosing the existence or non-existence of the very information that is protected by its *Glomar* responses. In other words, the existence or non-existence of briefing materials about activities that would be documented by

the records sought in items 1-4 of Plaintiff's wiretap request would itself tend to reveal the existence or non-existence of such records, and thus undermine the FBI's *Glomar* response.

(24)  Media speculation and non-authoritative reports relying on anonymous/unnamed sources do not constitute official disclosures on behalf of the FBI, and therefore do not undermine the FBI's *Glomar* response in this matter. The FBI generally does not confirm or deny the accuracy of reports attributed to unnamed, anonymous, or unofficial sources because responding in either fashion could reasonably be expected to cause harm to protected law enforcement and/or national security interests. Specifically, confirming such reports would require the disclosure of law enforcement sensitive information about pending investigations, investigative targets or activities, classified information, or other information that would be damaging to law enforcement or national security interests. Indeed, some public reports based on unnamed/anonymous sources contain classified information, so confirming those reports would perpetuate the improper public dissemination of classified information. Similarly, the FBI usually cannot respond to such reports only when they are incorrect because that would, itself, highlight those instances when they are correct.

## FOIA EXEMPTION (b)(1)

(25)  FOIA Exemption (b)(1) protects records that are: "(A) specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy and (B) are in fact properly classified pursuant to such Executive order." 5 U.S.C. § 552(b)(1).

(26)  E.O. 13526 § 1.1(a) provides that information may be originally classified under the terms of this order only if all of the following conditions are met: (1) an original classification authority is classifying the information; (2) the information is owned by, produced

by or for, or is under the control of the U.S. Government; (3) the information falls within one or more of the categories of information listed in § 1.4 of E.O. 13526; and (4) the original classification authority determines that the unauthorized disclosure of the information reasonably could be expected to result in some level of damage to the national security, and the original classification authority is able to identify or describe the damage.

(27)     E.O. 13526 explicitly authorizes precisely the type of response that the FBI has provided to Plaintiffs in this case. Specifically, § 3.6(a) provides that "[a]n agency may refuse to confirm or deny the existence or nonexistence of requested records whenever the fact of their existence or nonexistence is itself classified under this order or its predecessors."

(28)     Consistent with E.O. 13526 and as described below, I have determined that acknowledging the existence or nonexistence of the records requested by Plaintiff would require the FBI to disclose properly classified facts that concern § 1.4(c) ("intelligence activities, sources, and methods") and § 1.4(d) ("foreign relations and foreign activities of the United States"). Moreover, responsive records, if they exist, would be owned by and under the control of the U.S. Government. Finally, I have determined that acknowledging the existence or non-existence of the requested records reasonably could be expected to result in damage to national security.

(29)     My determination that the existence or nonexistence of the requested records is classified has not been made to conceal violations of law, inefficiency, or administrative error; to prevent embarrassment to a person, organization, or agency; to restrain competition; or to prevent or delay the release of information that does not require protection in the interests of national security.[2]

---

[2] To the extent possible on the public record, I have explained the harm to national security that would result from confirming or denying the existence or non-existence responsive records here. If the Court finds that

### Intelligence Activities, Sources, and Methods

(30) The records requested by Plaintiff, if they exist, implicate classified intelligence activities and methods, and acknowledging the existence or non-existence of any such records reasonably can be expected to cause damage to national security. An intelligence activity or method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest, and includes any procedure (human or non-human) utilized to obtain information concerning such individual or organization. An intelligence activity or method has two characteristics. First, the intelligence activity or method, and information generated by it, is needed by United States Intelligence/Counterintelligence agencies to carry out their missions. Second, confidentiality must be maintained with respect to the use or non-use of the activity or method, including intelligence sources, if the viability, productivity, and usefulness of the activity, method, and source are to be preserved.

(31) Intelligence activities and methods must be protected from disclosure in every situation in which a certain intelligence capability, technique, or interest – or its specific use – is unknown to the groups against which it is deployed, since those groups could take countermeasures to nullify its effectiveness. Intelligence activities and methods are valuable only so long as they remain unknown and unsuspected. Once an intelligence activity or method – or the fact of its use or non-use in a certain situation – is discovered, its continued successful use is seriously jeopardized.

(32) The U.S. Government must do more than prevent explicit references to an intelligence activity or method; it must also prevent indirect references to them. One vehicle for

---

explanation inadequate, Defendants could offer further explanation *ex parte* and *in camera*.

gathering information about the U.S. Government's capabilities is by reviewing officially-released information. We know that terrorist organizations and other hostile or Foreign Intelligence groups have the capacity and ability to gather information from myriad sources, analyze it, and deduce means and methods from disparate details to defeat the U.S. Government's collection efforts. Thus, even seemingly innocuous, indirect references to an intelligence activity, source, or method could have significant adverse effects when juxtaposed with other publicly-available data.

(33) Here, acknowledging the existence or non-existence of records responsive to Plaintiffs' request would be tantamount to confirming whether or not the FBI has relied on a particular intelligence activity or method targeted at particular individuals or organizations, particularly in an ongoing national security investigation. This information would reveal otherwise non-public information regarding the nature of the FBI's intelligence interests, priorities, activities, and methods—information that is highly desired by hostile actors who seek to thwart the FBI's intelligence-gathering mission. Accordingly, to confirm or deny that the FBI possesses or does not possess records responsive to Plaintiff's request could risk compromising intelligence activities or methods, and thus would pose at least a serious risk to the national security.[3]

### Foreign Relations and Foreign Activities of the United States

(34) Responding to Plaintiff's request specifically as to FISA-related materials with anything other than a *Glomar* response would also reveal information concerning U.S. foreign relations and foreign activities, the disclosure of which reasonably can be expected to cause

---

[3] FISC orders, applications, and minimization procedures are classified, at a minimum, at the SECRET level.

damage to national security. Plaintiff's request necessarily implicates U.S. foreign relations and foreign activities in relation to foreign governments or government officials/employees.

(35) The Foreign Intelligence Surveillance Act prescribes procedures for the physical and electronic surveillance and collection of "foreign intelligence information" between "foreign powers" and "agents of foreign powers" suspected of espionage and terrorism. Thus, on its face, a request for information about FISA materials implicates foreign relations and foreign activities because those are at the heart of the FBI's use of FISA as an intelligence and investigative tool.

(36) The FBI's confirmation or denial of the existence of responsive records could reasonably be expected to cause damage to the national security interests of the United States by negatively impacting U.S. foreign relations with these and other countries. Any response by the FBI would confirm or refute whether or not the FBI is using FISA as a tool to target purported activities by specific foreign governments or foreign actors, which could damage the United States' relationship with those and/or other countries, and thereby damage the national security interests of the United States.

(37) Such disclosure could weaken, or even sever, the relationship between the United States and its foreign partners (present and future), thus degrading the Government's ability to combat hostile threats abroad. Further, any confirmation of records could be interpreted by some to mean that certain foreign liaison partners were involved in espionage against the United States, which could have political implications in those and other countries and also make them less willing to cooperate with the U.S. Government in the future. Given the sensitivity of the United States' present and future relationships with foreign countries and the importance of such relationships to our national security, requests like Plaintiff's—which, directly or indirectly, call for records that would relate to sensitive and appropriately classified details of the United States'

relationship with foreign government(s)—reflect precisely the situation in which the FBI finds it necessary to assert a *Glomar* response.

### FOIA EXEMPTION (b)(3)

(38) FOIA Exemption (b)(3) protects information "specifically exempted from disclosure by statute . . . , provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3).

(39) Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 403-1 (i)(1) (the "National Security Act"), provides that the Director of National Intelligence ("DNI") "shall protect intelligence sources and methods from unauthorized disclosure." Accordingly, the National Security Act constitutes a federal statute which "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue" under 5 U.S.C. § 552(b)(3). Under the direction of the DNI, other components within the U.S. Government are authorized to protect intelligence sources and methods from unauthorized disclosure.

(40) As previously described in relation to Exemption (b)(1), acknowledging the existence or non-existence of records responsive to Plaintiff's request would tend to reveal whether an intelligence method[4] is being deployed against a particular target or organization, thus compromising the national security interests of the United States. Accordingly, the

---

[4] An intelligence method includes any intelligence action or technique utilized by the FBI against a targeted individual or organization determined to be of national security interest; any procedure (human or non-human) or intelligence source, used to obtain information concerning the individual or organization; and foreign liaison relationships.

National Security Act, in conjunction with Exemption (b)(3), provides an additional and independent basis for the FBI's *Glomar* response to Plaintiff's request.

### FOIA EXEMPTIONS (b)(7)(A) AND (b)(7)(E)

#### *Exemption (b)(7) Threshold*

(41) Before an agency can invoke any of the harms enumerated in Exemption (b)(7), it must first demonstrate that the records or information at issue were compiled for law enforcement purposes. Law enforcement agencies such as the FBI must demonstrate that the records at issue are related to the enforcement of federal laws and that the enforcement activity is within the law enforcement duty of that agency.

(42) Pursuant to 28 U.S.C. §§ 533 and 534, Executive Order 12333 as implemented by the Attorney General's Guidelines for Domestic FBI Operations ("AGG-DOM"), and 28 C.F.R. § 0.85, the FBI is the primary investigative agency of the federal government, with authority and responsibility to investigate all violations of federal law not exclusively assigned to another agency; to conduct investigations and activities to protect the United States and its people from terrorism and threats to national security; and to further the foreign intelligence objectives of the United States.

(43) The only circumstance under which the FBI can request – and the Department of Justice can and would seek on the FBI's behalf – a FISA, Title III, or other surveillance order is when the FBI is conducting an authorized, predicated investigation[5] within the scope of its law enforcement and, with respect to FISA, its foreign intelligence responsibilities. Accordingly, the types of wiretap/electronic surveillance records Plaintiff requested – when they exist – are records compiled for law enforcement purposes.

---

[5] FISA authority can only be requested as part of a predicated national security investigation.

### *Exemption (b)(7)(A)*

(44)    FOIA Exemption 7(A) protects "records or information compiled for law enforcement purposes [when disclosure] could reasonably be expected to interfere with enforcement proceedings."  5 U.S.C. § 552(b)(7)(A).

(45)    In addition to satisfying Exemption (b)(7)'s threshold, an agency must establish that (a) there is a pending or prospective law enforcement proceeding and (b) disclosure of responsive records could reasonably be expected to adversely affect it.

(46)    As previously noted, the FBI has publicly acknowledged that it is conducting an investigation into the Russian government's efforts to interfere in the 2016 presidential election, to include investigating into the nature of any links between individuals associated with the Trump campaign and the Russian government and whether there was any coordination between the campaign and Russia's efforts.  To the extent that Plaintiff is seeking records that it believes to be related to that investigation, that investigation satisfies the requirement of a pending enforcement proceeding in Exemption (b)(7)(A) because it is an active investigation, currently under the direction of Special Counsel Mueller.

(47)    Moreover, the final element – interference with that investigation – is readily established.  Confirming or denying the existence or non-existence of responsive records would reveal non-public information about the focus, scope, and conduct of that investigation. Specifically, it would reveal whether or not specific investigative techniques have been used; when and to what extent they were used, if they were; their relative value or benefit if they were used; and the targets they were used against, if any.  None of this information about the Russian interference investigation has been publicly disclosed and prematurely disclosing it here would give targets and others intent on interfering with the FBI's investigative efforts the information

necessary to: take defensive actions to conceal criminal activities; develop and implement countermeasures to elude detection; suppress, destroy, or fabricate evidence; and identify potential witnesses or sources, exposing them to harassment, intimidation, coercion, and/or physical threats. Accordingly, to the extent that Plaintiffs' request seeks records in relation to this investigation, confirming or denying the existence or non-existence of responsive records could reasonably be expected to adversely affect it.

(48)    Finally, to the extent that Plaintiff's request implicates some other investigation, responsive records – if they exist – would likely also be related to a pending investigation, given the facts, circumstances, and timing of its request. Confirming or denying that the FBI does or does not possess responsive records would require the FBI to reveal sensitive investigative information that could reasonably be expected to cause the same harms described in the prceding paragraph.

(49)    Therefore, the FBI can neither confirm nor deny the existence or non-existence of records responsive to Plaintiff's request without causing harms protected against by FOIA Exemption (b)(7)(A).

### *Exemption (b)(7)(E)*

(50)    FOIA Exemption (b)(7)(E) protects "records or information compiled for law enforcement purposes [when disclosure] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552 (b)(7)(E). This exemption affords categorical protection to techniques and procedures used in law enforcement investigations; it protects techniques and procedures that are not well-known to the public as well as non-public details

about the use of well-known techniques and procedures.

(51)    How the FBI applies its investigative resources (or not) against a particular allegation, report of criminal activity, or perceived threat is itself a law enforcement technique or procedure that the FBI protects pursuant to Exemption (b)(7)(E).

(52)    As previously demonstrated, acknowledging or denying the existence or non-existence of the law enforcement records Plaintiff seeks would be tantamount to confirming or denying whether or not it is employing specific investigative techniques authorized under the FISA, Title III, or other investigative authority against specific targets as part of its pending Russian interference investigation or some other investigation. Even in acknowledged investigations, the FBI does not routinely disclose whether or not it has employed FISA-authorized surveillance, a classified investigative technique, against a particular target, nor does it routinely advise targets of pending investigations that the FBI is employing particular investigative techniques against them. Indeed, the very concept of electronic – or other – surveillance is that it is conducted covertly. Acknowledging when and under what circumstances the FBI relies upon these authorized law enforcement techniques in an investigation against particular targets would provide them and other adversaries with insight into the activities likely to attract – or not attract – the FBI's law enforcement attention. These individuals would then be able alter their behavior to avoid attention by law enforcement, making it more difficult for the FBI to be proactive in assessing threats and investigating crimes. Therefore, the FBI can neither confirm nor deny the existence of records responsive to Plaintiff's request without causing harms protected against by FOIA Exemption (b)(7)(E).

## SEARCH AND PROCESSING RECORDS REQUEST – NO RECORDS RESPONSE

(53)    Finally, Plaintiff requested records relating to the FBI's processing of this FOIA

request and in particular records about its search for records responsive to Plaintiff's wiretap request; in other words, records that did not exist at the time of Plaintiff's request and that exist *only* because of its request.

(54) The normal cut-off date for responsive records used by the FBI for FOIA requests is the date on which searches were initiated. *See* 28 C.F.R. § 16.4(a) ("In determining which records are responsive to a request, a component ordinarily will include only records in its possession as of the date it begins its search."). However, alternate cut-off dates are permissible. *Id.* Here, no search was conducted with respect to the wiretap request, so the FBI used the date on which it began working on its response to this request – March 27, 2017 – as the alternate cut-off date. Because the FBI did not start to create records about the processing of this request until the day it started working on the request – *i.e.*, March 27, 2017 – no responsive records existed or were in the possession of the FBI as of cut-off date for responsive records in this case.

(55) To be certain of this conclusion, however, the FBI reviewed its FOIA Document Processing System (FDPS) to ensure that no processing records pre-dating March 27, 2017, existed in the system, and concluded that no such records exist. FDPS is the system in which the FBI maintains FOIA requests, associated processing records, and responsive records. FOIA processing records would not exist in any other system or location.

## CONCLUSION

(56) For the reasons set forth above, the FBI: (a) has no records responsive to the "wiretap" portion of Plaintiff's request to the extent that the request seeks records related to the President's March 4th tweet; (b) neither confirms nor denies the existence of other records responsive to the "wiretap" portion of Plaintiff's request because merely acknowledging whether

or not responsive records exist would itself cause harms protected against by FOIA Exemptions (b)(1), (b)(3), (b)(7)(A), and (b)(7)(E); and (c) has no records responsive to the "search and processing records" portion of Plaintiff's request because no such records were created until after the cut-off date for responsive records.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, and that Exhibits A-C attached hereto are true and correct copies.

Executed this 1st day of September, 2017.

David M. Hardy
Section Chief
Record/Information Dissemination Section
Records Management Division
Federal Bureau of Investigation
Winchester, Virginia